UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PAUL HARTMAN, and on behalf of himself and all others similarly situated, | : <br> : <br> : |
| Plaintiffs | : |
| vs. | : Civil Action No. <br> : |
| RICHARD SACKLER, DAVID SACKLER, ILENE SACKLER LEFCOURT, JONATHAN SACKLER, KATHE SACKLER, MORTIMER SACKLER, THERESA SACKLER, PETER BOER, JUDITH LEWENT CECIL PICKETT, PAULO COSTA, RALPH SNYDERMAN, RALPH SNYDERMAN, JOHN STEWART, MARK TIMNEY, CRAIG LANDAU, & RUSSELL GASDIA | : Class Action Complaint <br> : <br> : Demand for Trial <br> : <br> : <br> : <br> : <br> : |
| Defendants | : |

**CLASS-ACTION COMPLAINT**

### I. **PARTIES**

1.      Plaintiff Paul Hartman is a citizen of the Commonwealth of Pennsylvania, a nurse and an individual who confronts the opioid addiction defendants systematically imposed upon his life.  Plaintiff brings this action on behalf of himself and all other similarly situated persons for defendants violations of (i) the Pennsylvania Unfair Trade Practices and Consumer Protection Law, and (ii) Sec. 402A of the Restatement (Second) of Torts.

2.      Defendants are Richard Sackler, David Sackler,, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, Theresa Sackler, Peter Boer, Judith Lewent, Cecil Pickett, Paulo Costa, Ralph Snyderman, John Stewart, Mark Timney, Craig Landau, and Russell Gasdia.  Each of the defendants has played a significant role in spreading opioid addiction throughout the Commonwealth of Pennsylvania.  Through their intended conduct defendants have gained extreme monetary wealth and caused extreme financial  harm to the addicted and

their families.

3.      Defendants Richard Sackler, David Sackler,  Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, Theresa Sackler, each engaged in deceptive sales and marketing practices by which they sold opioids and took for themselves billions of dollars.

4.      Defendants Peter Boer, Judith Lewent, Cecil Pickett, Paulo Costa, and Ralph Snyderman, although not Sackler family members, had knowledge of the conduct by which the Sackler family operated their sales of opiods and acted in a manner which advanced the Sackler's scheme.

5.      Defendants John Stewart, Mark Timney and Craig Landau each served the Sackler family by following their wishes and directives in deceiving the public of the true ramifications of use of opioids.

6.      Defendant Rusell Gasdia, knowingly carried out the Sackler's system of distributing life threatening pills which defendants knew were highly addictive and deadly.

7.      Beverly Sackler, Jonathan Sackler, Kathe Sackler, Paulo Costa, Mark Timney and Craig Landau, at all relevant times, resided/reside in Connecticut.

8.      David Sackler, Ilene Sackler Lefcourt, and Mortimer Sackler, at all relevant times, resided/resides in New York State.

9.      Richard Sackler, Peter Boer, and John Stewart, at all relevant times, resided/reside in Florida.

10.     Judith Lewent and Cecil Pickett, at all relevant times, resided/reside in New Jersey.

2

11.    Ralph Snyderman, at all relevant times, resided/resides in North Carolina.

Theresa Sackler, at all relevant times resided/resides in the United Kingdom.

Russell Gasdia, at all relevant times resided/resides in Massachusetts.

## II.    JURISDICTION AND VENUE

12.    This Court has both general and subject-matter jurisdiction over the parties and over the subject matter of the causes of action asserted in this Complaint in that Defendants routinely, continuously, systematically, and substantially did and continues to do business in Pennsylvania, specifically Philadelphia County, Bucks County, Chester County, Delaware County, Montgomery County, Berks County, Lancaster County, Lehigh County and Northampton County giving rise to transactions or occurrences therein.

13.    This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. Sec. 1332(d), because at least one Class member is of diverse citizenship from Defendants, there are more than 100 Class members and the aggregate amount in controversy exceeds $5,000,000.

14.    This Court has personal jurisdiction over Defendants as they directly engaged in business transactions within the Commonwealth, such that it has sufficient minimum contacts with the Commonwealth of Pennsylvania.

15.    Venue is proper under 28 U.S.C. Sec. 1391(b)(1) and (2) as a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

3

## III.  STATEMENT OF FACTS

16.     Defendants conduct has imposed substantial financial costs upon the members of the Class.  The United States Centers for Disease Control and Prevention (CDC) adapted the methodology employed by the Council for Economic Advisers (CEA) to determine the economic cost of the opioid epidemic.  In November 2017 an analysis of the economic costs of the opioid epidemic in Pennsylvania for the year of 2016 was over **$53.77 billion.**

17.     The five types of cost incurred in 2016 were (1) health care spending, which totaled $1,499,290,000.00; (2) addiction treatment, which totaled $162,150,000.00; (3) criminal justice operations, which totaled $440,100,000.00; (4) lost productivity, which totaled $1,175,340,000.00; and (5) opioid-related fatalities, $50,497,910,000.00.

18.     Prior to 1996, physicians prescribed opioids for treating short-term severe pain for patients near end of life.

19.     In 1996, defendants introduced OxyContin.  OxyContin's sole active ingredient is Oxycodone, a molecule nearly identical to heroin.

20.     Defendants knew that OxyContin carried grave risks of addiction and death. Defendants obscured the risks by falsely stating and implying that "appropriate' patients would not get addicted, despite Defendants knowledge that (1) OxyContin was more addictive than morphine and (2) they knew that doctors were lead to believe that OxyContin was NOT more addictive than morphine.

4

21.     In a pamphlet for doctors, *Providing Relief, Preventing Abuse: A Reference Guide To Controlled Substance Prescribing Practices,* defendants wrote that addiction "is not caused by drugs." Instead they assured doctors that addiction happens when the wrong patients get drugs and abuse them: "it is triggered in a susceptible individual by exposure to drugs, most commonly through abuse." Providing Relief, Preventing Abuse (2008), pg. 12.

22.     Defendants promoted their product with marketing that was designed to obscure the risk of addiction and even the fact that they were behind the campaign. Defendants created a website, *In The Face of Pain*, that promoted pain treatment by urging patients to "overcome" their "concerns about addiction." Defendants utilize consultants to present false personal stories.

23.     Defendants created publications, such as the *Resource Guide for People with Pain*, to falsely assure patients and doctors that opioid medications are not addictive:

> *"Many people living with pain and even some healthcare providers believe that opioid medications are addictive. The truth is that when properly prescribed by a healthcare professional and taken as directed, these medications give relief – not a "high"."*
> Resource Guide for People with Pain (2009)

Defendants falsely denied the risk of addiction, falsely implied that addiction requires patients to get "high," and falsely promised that patients would not become addicted if they took opioids as prescribed.

24.     Defendants funded and distributed numerous publications that were similarly misleading. *Exit Wounds: A Survival Guide to Pain Management for Returning Veterans and Their Families* falsely claimed: "Long experience with opioids shows that people who are not predisposed to addiction are unlikely to become addicted opioid pain medications." Exit Wounds (2009), pg. 107.

25.    Defendants told doctors in *Opioid Prescribing: Clinical Tools and Risk Management Strategies* that "addiction is rare in patients who become physiologically dependent on opioids while using them for pain control."  Opioid Prescribing: Clinical Tools and Risk Management Strategies (2009), pg. 12.

26.    Defendants told doctors in *Responsible Opioid Prescribing* that only "a small minority of people seeking treatment may not be reliable or trustworthy" and not suitable for addictive opioid drugs.  Responsible Opioid Prescribing (2007), pg. 11.

27.    Defendants trained sales reps to promote drugs specifically for opioid-naive patients.  Sales reps were instructed  to hook the naive patient by:

a)  showing doctors charts emphasizing Medicare coverage for its opioids together with profiles of elderly patients, complete with staged photographs, to convince doctors to prescribe opioids;

b.)  telling doctors that putting elderly patients on opioids would improve their safety and quality of life by addressing "the need for sleep for the elderly, increased risk for falls if they need to get up at night–take a pill, get a glass, move across a dark room–and the potential impact that could have on healing and mobility";

c.)  targeting veterans via the book, Exit Wounds, which intentionally lied to veterans by stating that patients would not become addicted to opioids:

> *"The pain-relieving properties of opioids are unsurpassed; they are today considered the 'gold standard' of pain medications, and so are often the main medications used in the treatment of chronic pain.  Yet, despite their great benefits, opioids are underused.  For a number of reasons, healthcare providers may be afraid to prescribe them, and Patients may be afraid to take them.  At the core of this wariness is the fear of addiction, so I want to tackle this issue head-on ... Long experience with opioids shows that people who are not predisposed to addiction are unlikely to become addicted to opioid pain medications."*

Exit Wounds (2009), pgs. 106-107;

d.)  promoting OxyContin as "first line opioid"  – "the first thing they would take to treat pain" even though opioids are not an appropriate first line therapy;

e.)  targeting new patients with the deceptive claim that its opioids should be used to treat the most common forms of arthritis and osteoarthritis even though opioids are not approved to treat osteoarthritis.

28. To maximize revenue, the defendants increased the dose for OxyContin and developed the slogan, Individualize The Dose.  Defendants taught theirs sales reps that increasing a patient's dose ("titration") was the key when making sales. (Titration is the chemical process used to ascertain the quantity of a given constituent present in a solution by adding a liquid reagent of known strength and measuring the volume necessary to convert the constituent to another form.)

29. When patients showed signs of addiction to opioids manufactured by defendants, defendants urged doctors to respond by increasing the opioid dose.  To persuade doctors to increase the dose for the addicted patients, defendants peddled the false notion that patients suffered from "pseudoaddiction."

30. A pamphlet authored by defendants, titled *Clinical Issues in Opioid Prescribing* urged doctors to look for pseudoaddiction:

> *"A term which has been used to describe patient behaviors that may occur when pain is undertreated.  Patients with unrelieved pain may become focused on obtaining medications, may 'clock watch,' and may otherwise seem inappropriately "drug-seeking."  Even such behaviors as illicit drug use and deception can occur in the patient's efforts to obtain relief.  Pseudoaddiction can be distinguished from true addiction in that the behaviors resolve when the pain is effectively treated."*

7

31. In *Clinical Issues in Opioid Prescribing*, at pages 1-3, Defendants urged doctors to prescribed higher doses, stating that opioids "are frequently underdosed - or even withheld due to a widespread lack of information ... about their use among healthcare professionals."

32. In another pamphlet prepared by Defendants, *Providing Relief, Preventing Abuse: A Reference Guide To Controlled Substances Prescribing Practices*, Defendants asserted that:

> 1. "[u]ndertreatment of pain is a serious problem[,]"
>
> 2. "pain should be treated aggressively"
>
> 3. "Misunderstanding of addiction and mislabeling of patients as addicts results in unnecessary withholding of opioid medications[.]"

33. The second edition of *Providing Relief, Preventing Abuse* continued to persuade huge segments of the medical profession to prescribe higher doses based upon further deception about the scientific "literature" by adding the following statement:

> *"The term pseudoaddiction has emerged in the literature to describe the inaccurate interpretation of [drug-seeking] behaviors in patients who have pain that has not been effectively treated."*

34. The second edition of *Providing Relief, Preventing Abuse* in making the foregoing statement failed to disclose that none of the "literature" cited included scientific or medical evidence supporting "pseudoaddication" as a diagnosis separate from addiction; nor was there disclosure that the cited "literature" was linked to organizations and doctors paid by Defendants.

35. In addition to aforementioned publications, Defendants sponsored *Responsible Opioid Prescribing*, which suggested that patients appearing to be addicted appeared so because they were *"receiving an inadequate dose"* and needed more drugs.

8

36.  Doctors on Defendants' payroll have admitted in writing that "pseudoaddiction" was used to describe *"behaviors that are clearly characterize as drug abuse"* and that Defendants' *"ignore"* addition and *"sanctioned abuse."*

37.  Compared to the general population, a patient who receives three months of prescribed opioids is 30 times more likely to overdose and die.  A patient who stays on prescribed opioids for 6-11 months is 46 times more likely to die.  A patient who stays on prescribed opioids for a year is 51 times more likely to die.

38.  When the U.S. Centers for Disease issued a national warning against the highest and most dangerous doses of opioids, Defendants studied prescription data to calculate how much profit it would lose if doctors followed the CDC's advice.  Defendants determined that the amount at stake for Pennsylvanians was tens of millions of dollars that were the extra revenue that Defendants were getting from the most dangerous doses of opioids, every year in Pennsylvania alone.

39.  Defendants' practice of calculating how much profit they would lose if doctors followed the CDC's advice evidences the lack of integrity of each and every member of the Sackler family. Richard Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, Theresa Sackle and David Sackler each engaged in criminal misconduct.

9

40.   By 1995 Defendants had developed a new form of opioids - OxyContin.  FDA scientist Curtis Wright conducted the first evaluation of OxyContin, in October 1995, and concluded, *"Care should be taken to limit competitive promotion."*

41.   The Sacklers disagreed.  In 1996, they launched OxyContin.  From the beginning of the launch the Sacklers viewed limits on opioids as an obstacle to greater profits.  The Sacklers considered selling OxyContin in some countries as an uncontrolled drug.  In February of 1997, the Sackler's staff reported to them that selling Oxycontin as *"non-narcotic,"* without the safeguards that protect patients from addictive drugs would provide *"a vast increase of the market potential."*

42.   Robert Kaiko, the inventor of OxyContin, wrote to Richard Sackler to oppose the Sacklers intentions.  Kaiko explained his very serious concern about the danger of selling OxyContin without strict controls.  In his February 27, 1997 email to  Richard Sackler, Kaiko stated, *"I don't believe we have a sufficiently strong case to argue that OxyContin has minimal or no abuse liability"* and to the contrary *"oxycodone containing products are still among the most abused opioids in the U.S."*  Kaiko further wrote, *"If OxyContin is uncontrolled,...it is highly likely that it will eventually be abused."*

43.   Richard Sackler's response to Kaiko's concerns was, *"How substantially would it improve your sales?"*

10

44.   The Sackler's chose to deceive doctors and patients.  In 1997, Richard Sackler and Kathe Sackler determined that the doctors had to continue to hold the misconception that OxyContin was weaker than morphine, which led them to prescribe OxyContin more often, even as a substitute for Tylenol.  Defendants determination was recorded in secret internal correspondence:

> Staff reported: "Since oxycodone is perceived as being a 'weaker' opioid than morphine, it has resulted in OxyContin being used much earlier for non-cancer pain.  Physicians are positioning this product where Percocet, hydrocodone, and Tylenol with Codeine have been traditionally used.  Since the non-cancer pain market is much greater than the cancer pain market, it is important that we allow this product to be positioned where it currently is in the physician's, mind."

> Richard Sackler replied: "I think you have this issue well in hand.  If there are developments, please let me know."

June 6, 1997 email from Richard Sackler

45.   In 1998, the Sacklers continued their strategy to push opioids solely to further enrich themselves.  Richard Sackler instructed the aforementioned co-defendants to market OxyContin tablets as having more than "therapeutic" value and instead as having "enhance personal performance," value like Viagra.

46.   Starting in 1999, the Sacklers hired hundreds of additional sales representatives, whom they used to deceive doctors into believing that the risk of addiction to OxyContin was "less than one percent."   The Sacklers were so driven by greed they increased the number of sales representatives from 771 in 1999 to 1,066 in 2001.  See, 12/23/2003 GAO Report

11

47.   The Sacklers were so driven to increase their wealth that they mailed thousands of

doctors promotional videos with that same false claim:

> *"There's no question that our best, strongest pain medicines are the*
> *opioids.  But these are the same drugs that have a reputation for causing*
> *addiction and other terrible things.  Now, in fact, the rate of addiction*
> *amongst pain patients who are treated by doctors is much less than one*
> *percent.  They don't wear out, they go on working, they do not have*
> *serious medical side effects."*

*"*I Got My Life Back" video, transcript Defendants.

48.   In 1999, an employee reported to the Sacklers that Richard Sackler was making

more than  $20,000,000 per week, which Richard Sackler replied immediately that were "not so

great."

49.   In 2000, reporters began to raise questions about what was the appropriate use of

OxyContin.  In January 2001, Defendants' sales reps began to hear and see the range of overdose

on OxyContin by high school aged children.  In February 2001, a federal prosecutor reported 59

deaths from OxyContin in a single state.  The Defendants knew the reports underestimated the

widespread pandemic.

50.   In the spring of 2001, the Sacklers met with the U.S. Drug Enforcement Agency

("DEA").  Before the end of the meeting Laura Nagel, the head of the DEA Office of Diversion

Control, told Richard Sackler: "People are dying.  Do you understand that?"

51.   Starting in 2003, under the wave of investigations by state attorneys general, the DEA, and the U.S. Department of Justice the Defendants continued their manufacturing and distribution of opioids.

52.   By 2006, prosecutors found damning evidence that Defendants intentionally deceived doctors and patients about the opioids.  In response thereto one of the Sacklers corporate entities plead guilty to a felony for misbranding OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause adverse events and side effects than other pain medications.  The Sacklers also had three of their executives plead guilty as individuals in lieu of any of the Sackler family members.

53.   On May 9, 2007, the Sacklers again voted to have their company plead guilty and enter a series of agreements by which the Sacklers' business would never deceive doctors and patients about opioids again.  The Sacklers admitted in an Agreed Statement of Facts that, for more than six years, Sacklers' supervisors and employees *intentionally* deceived doctors about OxyContin:

> *"Beginning on or about December 12, 1995, and continuing until on or about June 30, 2000, certain Purdue supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications."*

13

54.    The Sacklers agreed to enter a Corporate Integrity Agreement with the U.S. government which required the Sacklers to ensure that Defendants: (a) did not deceive doctors and patients again; (b)  would comply with rules that prohibit deception about opioids manufactured by Defendants; (c)  complete hours of training to ensure compliance with the rules; (d)  report any deception; and (e)  have each of the Sacklers certify in writing to the government that he or she had read and understood the rules and would obey them.

May 5, 2007 Plea Agreement and  May 4, 2007 Associate General Counsel's Certificate.

55.  In addition to the Corporate Integrity Agreement, Defendants were required to establish and follow an abuse and diversion detection program to (1) identify high-prescribing doctors who showed signs of inappropriate prescribing; (2) stop promoting drugs to them; and (3) report them to authorities.

56.    Despite the foregoing, the Sacklers directed Defendants to hire hundreds  more sales reps to visit doctors thousands of times more. In doing so the Sacklers (1) directed reps to encourage doctors to prescribe more of the highest doses of opioids; (2) studied and implemented unlawful tactics to keep patients on opioids; (3) accessed detailed reports about doctors suspected of misconduct; (4) analyzed how much money Defendants made from them and (5) kept sight of how many/few doctors Defendants had reported to the authorities.

57.    The Sacklers also directed Defendants to falsely instruct doctors and patients that physical dependence on opioids  is not dangerous and instead improves patients' "quality of life" just as Richard Sackler had been asserting since the 1990s.

14

58.   To protect themselves from governmental review and simultaneously continue their pushing of opioids, the Sacklers called upon four of the Defendants to assist them in continuing to operate business outside the law.   The first key executive was John Stewart, whom the Sacklers made CEO in 2007; a position Stewart held to 2013.   The second was Russell Gasdia, whom the Sacklers made Vice President of Sales and Marketing in 2007; a position Gasdia held to 2014.   The third was Mark Timney, whom the Sacklers made CEO in 2014 to pick up where John Stewart left off.   The fourth was Craig Landau , the Chief Medical Office from 2007 to 2013, and the individual the Sacklers made CEO since 2017.

59.   Stewart knowingly and intentionally sent sales representatives out to promote opioid sales.   Stewart, in collaboration with Gasdia, worked to quantify the "market impact" that adding sales representatives would have.   Their analysis resulted in approval of an expansion of new sales representatives.

60.   With the approval of the Sacklers', Steward and Gasdia set out to maximize revenue.   First, Steward, *inter alia*, saw to it that the medical community was flooded with two marketing pieces.   The first, "*Focused and Customized Education Topic Selections in Pain Management*" ("FACETS"), falsely instructed doctors and patients that physical dependence on opioids is not dangerous and instead improves patients' "quality of life."   FACETS also falsely told doctors and patients that signs of addition are actually "pseudoaddiction," and that doctors should respond by prescribing more opioids.    The second marketing piece, *"Complexities in Caring for People in Pain"* repeated again the false claim that warning signs of addiction are really "pseudoaddiction" that should be treated with more opioids.

15

61.  Gasdia, *inter alia,* worked to expand the sales force, from around 300 sales reps in 2007 to more than 600 sales reps in 2014.  Those sales reps would enable Purdue to reach 5,400 more prescribers and collect millions of dollars more in profit.  Gasdia did so by managing up the number of times sales reps would visit prescribers each day, quarter, and year.  Gasdia also managed down, tracking his reps adherence to his targets and how closely sales reps made sales.

62.  Gasdia focused on selling higher doses.  In 2011, Gasdia discovered that sales of most doses of OxyContin grew by $180,820 per sales rep from the year before.  Sales of the profitable and dangerous 40mg and 80mg doses declined by $321,826 per sales representative, thereby wiping out all gains.

63.  In 2013, Gasdia informed Stewart that the total kilograms of active ingredient sold by Defendants was dropping, "driven by the 40mg and 80mg strengths."  Gasdia and Stewart were aware that Defendants were losing millions of dollars in sales each month because doctors were prescribing lower does of opioids and fewer pills in each prescription than the Sacklers wanted.

64.  Gasdia presented Stewart with a confidential plan to push doctors and patients back to higher doses. Stewart was told that the sales employees would "place greater emphasis on appropriate titration" in "all promotional initiatives."  Gasdia then sent sales reps to promote high doses to doctors, knowing that sales rep visits drive high-dose prescriptions.  Thereafter Gasdia implemented marketing initiatives aimed at higher doses, including the *Individualize The Dose* campaign.

65.    Gasdia directed the sales reps to use marketing materials that did not disclose the risk of higher doses.  He proposed that Defendents reintroduce the 160mg OxyContin to increase sales. (The 160mg had the nickname "Oxy-Coffin.").  Gasdia, in a successful effort to increase profits, had doctors extending the time their patients remained in therapy by 41 days.  By so doing Defendants collected an extra $4,280,000 for every $1,000,000 it previously spent on therapy.

66.    In January 2014, Mark Timney became CEO, as John Stewart retired.  Timney directed the sales of Defendants' opioids and focused on the media coverage of opioid-related issues.  He also continued Stewart's aggressive sales strategy to increase profits.  To do so the Defendants had to increase the number of visits to high-volume and "high-value" prescribers.  However, many physicians no longer allowed sales reps in their clinics.  Timney responded by setting up and overseeing a call center where sales reps called restricted-access prescribers and promoted Defendants' opioids over the phone.

67.    In November 2014, Timney oversaw FDA approval of Hysingla ER, Defendant's newest opioid which came in strengths of up to 120 milligrams.

68.    In November 2015, Timney reported to Defendants that authorities were increasing efforts to restrict access to opioids.  Nevertheless, Timney, reported that opioid sales visits and market share were increasing, and the 2016 strategy sought to "expand the Sales Force," and "protect OxyContin against competition and grow Butrans & Hysingla ER."

17

69.     On March 15, 2016, during a telebriefing by then CDC Director Tom Frieden, stated:

> *We know of no other medication that's routinely used*
> *for a nonfatal condition that kills patients so frequently ...*
> *those who got the highest doses of opioids,, more than 200 MMEs*
> *per day had a 1 in 32 chance of dying in just 2 1/2 years ...*
> *almost all the opioids on the market are just as addictive as heroin.*

70.     In September 2016, Defendants sought to mitigate the reputational harm to the Defendants rather than addressing the harms arising from the opioid epidemic.  Timney focused on Defendants' profits and reputation.

71.     In late November 2016, Timney revealed that Defendants' Abuse and Diversion Detection system consisted of *ad hoc,* manual reviews of sales representatives call notes, media reports, internal searches, and prescribing records to identify opioid abuse and adverse events. Defendants had not complied with the convictions and terms of settlement reached in 2007.

72.     In April 2017, Gasdia resigned his position and Timney took hands on control of the sales and marketing of Defendants opioid market.

73.     In June, 2017,  Timney resigned.  Craig Landau, the Chief Medical Officer from 2007 to 2013, was hired as CEO.  As Chief Medical Officer, Landau received each Board report regarding Defendant's misconduct in 2007 through 2011, and the reports sent in April and November 2012.  Landua reported to Defendants directly.

18

74.     Landau had worked with Gasdia on training new hires and how to sell OxyContin.  In 2008, he addressed Defendant's entire sales force, and put a commercial representative on every team to orient research in ways that would sell more opioids.  In 2009, he headed up a staff /team to plan how to "counter the emotional messages from mothers with teenagers that overdosed in [sic] OxyContin" by rounding up some patients to imply that controlled-release is needed.  In 2010, he received reports from internet chat rooms where abusers show how to defeat OxyContin's new formulation.  He passed the information to Stewart and Gasdia.  In 2011, he drafted goals and objectives to generate support for the approval of OxyContin for children.  In 2013, Landau entered into a contract with Analgesic Research to develop Defendant's Hysingla opioid.

75.     From 2013 to 2017, Landau was the CEO of Defendants' Canada operations. Upon returning to the U.S., Landau found the U.S. business in a state of decline and would be unable to fund investments across the Sacklers' affiliated companies.  Landau set out to take advantage of the public concern about opioids, which caused a reduction in competition.

76.  Starting in 2008, the Sacklers asked five additional individuals to join them on the Board of Directors.  The first to join was Peter Boer, who served from April 2008 to January 2020.  Next was Judith Lewent, who served from March 2009 to December 2013.  Third was Cecil Pickett, who served from January 2010 to January 2020.  Fourth was Paulo Costa, who served from April 2012 to January 2018 and fifth was Ralph Snyderman, who served from August 2012 to October 2017.

77.    The foregoing Board members voted in lock step with the Sacklers on hundreds of votes.    They voted, *inter alia*, with the Sacklers to: (a) hire hundreds more sales reps to carry out Defendant's unfair and deceptive sales tactics; (b) implement incentive compensation policies that aggressively drove opioid sales, by placing outsized emphasis on prescription volume rather than compliance; (c) pay billions of dollars to the Sackler family, knowing that the funds came from Defendant's unlawful deception; (d) spend tens of millions of dollars to settle lawsuits by individuals alleging they were harmed by OxyContin; and (e) not address the hundreds of Reports of Concern regarding abuse and diversion of Defendant's opioids.

78.    The Commonwealth of Pennsylvania has publicly stated that Defendants, have sold more than 2.9 million prescriptions within the Commonwealth during the last ten years, amounting to over 200 million doses of opioids.

79.    Defendants, marketed OxyContin and Hysingla ER, through a highly trained and incentivized in-state opioid sales force.    During the 2014 through and including 2017 time period, defendants' sales force made 220,966 in-person sales visits to Pennsylvania doctors pushing doctors to prescribe more and more of Defendants' additive drugs.    The sole purpose of Defendants' business was to enrich themselves.

## IV. DISCOVERY RULE AND TOLLING

80. The Defendants' unfair or deceptive practices continued through May 2019.

81. The Defendants' unfair or deceptive practices were well concealed. The Defendants herein deliberately conducted their unfair or deceptive practices in order circumvent compliance with prior Judgments reached between the DEA, on behalf of our nations' citizens and defendants. In so doing the Defendants not only profited themselves but also imposed substantial monetary injuries to not only individuals whose lives were altered, but also to the families which shouldered heavy medical, financial and emotional harm.

82. Because of Defendants' deception, any statutes of limitation otherwise applicable to any claims asserted herein against all Defendants have been tolled by the discovery rule and rules regarding fraudulent concealment.

21

## VI. CLASS ACTION ALLEGATIONS

83.  This suit is brought as a Class Action pursuant to FRCP Rule 23(a), (b)(2) and (b)(3),

seeking damages and injunctive relief pursuant to federal law and pursuant the Pennsylvania

Unfair Trade Practices and Consumer Protection Act, 73 P.S. §§201-1 et. seq., specifically 73

P.S. 201-2(4); and Pennsylvania Common Law on behalf of the members of the following

Classes:

> **Sub Class A:**
>
> Individuals residing in the Commonwealth of Pennsylvania who (1) became addicted to OxyContin prescribed by a certified physician, (2) who have their addiction under control with the assistance and/or monitoring of a certified physician and/or medical aid, (3) can demonstratively establish loss of income related to their OxyContin addiction, and/or associated medical costs;
>
> **Sub Class B:**
>
> Parents who incurred medical costs for (1) the treatment and/or care of their children who became addicted to OxyContin and (2) funeral expenses for those children who have died from addiction to OxyContin, and
>
> **Sub Class C:**
>
> Spouses who lost their partner to OxyContin and as a result (1) lost their abode and/or (2) do/did not have the financial wherewithal to enable their children to have a post high school education, and/or (3) incurred funeral expenses for the deceased spouse and early death children.

84.  Excluded from the Classes are the Defendants.  Also excluded are the district judge

or magistrate judge to whom this case is assigned, as well as those judges' immediate family

members, judicial officers and their personnel, and all governmental entities.

85. Numerosity: Members of the Classes are so numerous that joinder is impracticable. Plaintiff believes that there are tens of thousands of members of the Class dispersed throughout the nine counties constituting the United States District for the Eastern District of Pennsylvania, such that joinder of all Class members is impracticable.

86. Typicality: Plaintiff's claims are typical of the claims of the other Class members. The factual and legal bases of Defendants' liability are the same and resulted in injury to Plaintiffs and all other members of the proposed Classes.

87. Equal Representation: Plaintiff will represent and protect the interests of the proposed Classes both fairly and adequately. He has retained counsel competent and experienced in complex class-action litigation. Plaintiff has no interests that are antagonistic to those of the proposed Classes, and their interests do not conflict with the interests of the proposed Class members he seeks to represent.

88. Commonality: Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the Classes and because Class members share a common injury. Thus determining damages with respect to the Classes as a whole is appropriate. The common applicability of the relevant facts to claims of Plaintiff and the proposed Classes are inherent in Defendants' wrongful conduct, because the injuries incurred by Plaintiffs and each member of the proposed Classes arose from the same conduct alleged herein.

89.  There are questions of law and fact common to the Class that predominate over any questions that may affect only individual Class Members.  These questions include, but are not limited to:

a.      Whether the Defendants' conduct violated Pennsylvania Unfair Trade Practices and Consumer Protection Act, 73 P.S. §§201-1 *et. seq.*, specifically, 73 P.S. §201-2(4);

b.      Whether the Defendants' conduct violated Pennsylvania common law; and

c.      The type and measure of damages suffered by Plaintiff and the Class Members.

90.  Prevention of inconsistent or  varying adjudications: If prosecution of a myriad of individual actions for the conduct complained of were undertaken, there likely would be inconsistent or varying results.  This would have the effect of establishing incompatible standards of conduct for the Defendants.  Certification of Plaintiff's proposed Classes would prevent these undesirable outcomes.

91.  Predominance and superiority: This proposed class action is appropriate for certification.  Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable.  Even if members of the proposed Classes could sustain indivdual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter.  Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court.  Further, uniformity of decisions will be ensured.

## VII.  CAUSES OF ACTION

### COUNT I

### Violation Pennsylvania Unfair Trade Practices and Consumer Protection Act

92.  Plaintiff incorporates by reference the allegations contained in Paragraphs 1 - 91, above as though set forth fully herein.

93.  The Pennsylvania Unfair Trade Practices and Consumer Protection Act, 73 P.S. §§201-1 *et. seq.*, prohibits unfair or deceptive practices.  Specifically, 73 P.S. §201-2(4) finds that the following are included in the definition of "unfair or deceptive acts or practices":

    (ii)    Causing likelihood of confusion or of misunderstanding as to the course, sponsorship, approval, or certification of goods or services;

    (v)    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;

    (ix)    Advertising goods or services with intent not to sell them as advertised; and

    (xxi)    Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding;

94.  The Defendants trained their sales representatives to deceive doctors that the risk of addiction to OxyContin was "less that one percent." *See, Pain Killer,* Barry Meier (1 ed. 2003) at page 99.  These unfair and deceptive acts and practices of the Defendants were clearly made with the intent to deceive the Class Representative Plaintiff and Class Members.  Plaintiff and the other Class Members relied upon such representations and/or omissions.

24

95.  By reason of the foregoing, Class Representative Plaintiff and the other Class Members have been damaged in an amount to be proven at trial.  In addition, because of the intentional nature of Defendants' violations, the damages to the Plaintiff and to the other Class Members should be trebled, and the Plaintiff and Class Members should be allowed to recover attorney's fees pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Act.

## COUNT II

### Sec. 402 A of the Restatement (Second) of Torts

96.  Plaintiff  incorporates by reference the allegations contained in paragraphs 1- 98, above as though set forth fully herein.

97.  As set forth above, the Defendants made affirmative misrepresentations to and concealed material facts from the Plaintiff and other Class Members.

98.  At the time Defendants misrepresentations were made and the material facts were omitted, the Defendants knew that the representations were false.

99.  As the direct and proximate result of Defendant's misrepresentations, Plaintiff and other Class Members have suffered monetary damages.

## JURY TRIAL DEMANDED

100.  Plaintiffs hereby demand a trial by jury of all claims asserted in this Complaint.

## PRAYER FOR RELIEF

101. **WHEREFORE,** the Plaintiff, on behalf of himself and of all others similarly situated, pray for judgment against Defendants as follows:

A.    The Court determines that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.    Adjudication that the acts alleged herein constitute unfair or deceptive acts or practices in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Act §§201-1 *et. seq.*, specifically, 73 P.S. §201-2(4);

C.    Adjudication that the acts alleged herein constitute violations of the Common Law of Pa.;

D.    Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

E.    Pre-judgment and post-judgment interest on such monetary relief;

F.    Equitable relief in the form of restitution and/or disgorgement of all unlawful or illegal profits received by Defendants as a result of their conduct alleged herein;

G.    Equitable relief requiring Defendants cease the abusive, unlawful, and the illegal practices described herein;

H.    The costs of bringing this suit, including reasonable attorneys' fees; and

I.    All other relief to which Plaintiffs and members of the Class may be entitled at law or in equity.

DATED: April 21, 2021

Respectfully submitted,

John F. Innelli, Esquire
**JOHN F. INNELLI, LLC**
Two Penn Center, Suite 1300
Philadelphia, Pa. 19102
484-326-0275
215-845-0255 (fax)

Kenneth Chotiner, Esquire
**THE CHOTINER FIRM**
50 Wynnewood Road
Suite 22-378
Wynnewood, Pa. 19096
(215)564-6544

Attorneys for Plaintiffs

27